1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9    APRIL D. REYES,                          CASE NO. 1:09-cv-00088-SMS

10                    Plaintiff,

11         v.                                 ORDER RE PLAINTIFF'S
                                              SOCIAL SECURITY COMPLAINT
12   COMMISSIONER OF
     SOCIAL SECURITY,

13
                     Defendant.
14   _____/

15

16

17         Plaintiff April D. Reyes, by her attorney, Geoffrey L. Hayden, seeks judicial review of a

18   final decision of the Commissioner of Social Security ("Commissioner") denying her application

19   for disability insurance benefits (DIB) under Title II of the Social Security Act and for

20   supplemental security income  ("SSI"), pursuant to Title XVI of the Social Security Act (42

21   U.S.C. § 301 *et seq.*) (the "Act").  The matter is currently before the Court on the parties' cross-

22   briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United

23   States Magistrate Judge.[1]  Following a review of the complete record, this Court concludes that

24   the ALJ's determination was not supported by substantial evidence.  Accordingly, the Court

25   reverses and remands for payment of benefits.

26   ///

27   ///

28
     _____

          [1]  Both parties consented to the jurisdiction of a United States Magistrate Judge (Docs. 11 & 12).

I.      **Administrative Record**

A.      **Procedural History**

On July 21, 2005, Plaintiff applied for disability benefits pursuant to Title II of the Social Security Act and for supplemental security income ("SSI"),  alleging disability beginning July 15, 2003.  AR 102-104.  Her claims were initially denied on November 10, 2005, and upon reconsideration, on April 19, 2006.  AR 20.  On June 12, 2006, Plaintiff filed a timely request for a hearing.  AR 20.  Plaintiff appeared and testified at a hearing on December 11, 2007.  AR 20, 30-49. On January 25, 2008, Administrative Law Judge Edward D. Steinman denied Plaintiff's application.  AR 17-29.   The Appeals Council denied review on October 27, 2008.  AR 12-14.  On January 8, 2009, Plaintiff filed a complaint seeking this Court's review (Doc. 1).

B.      **Factual Record**

Plaintiff was born April 17, 1967.  AR 150.  Her mother, father and many other family members are alcoholics.  AR 192, 195.  Plaintiff's father physically abused Plaintiff, her mother, and her sister.  AR 192.

Uncomfortable around others, Plaintiff hated school. AR 192.  She was sick, anemic and undernourished.  AR 192.  Plaintiff left school after finishing tenth grade.  AR 148, 192.

When Plaintiff was twelve years old, she began drinking alcohol.  AR 195.   She ran away from home to live with friends, relatives, and on the street.  AR 192.  Plaintiff and an older brother were sent to Oklahoma to live with their grandparents.  AR 192.  When Plaintiff was 13 and 14 years old, her older brother molested her.  AR 192.

Plaintiff was imprisoned multiple times while a juvenile and young woman.  AR 149, 191.  While in prison, Plaintiff did janitorial work, landscaping and food preparation., AR 191.

Plaintiff has six children who were 17, 15, 12, 10, 7, and 4 years old on July 29, 2002.  AR 195.  Each child has a different father; each of the fathers abused Plaintiff.  AR 192.  California Protective Services removed Plaintiff's minor children from her care in or about September 2004.  AR 173.

///

///

2

Plaintiff maintains that her stepfather molested Plaintiff's two daughters.  AR 192.
Plaintiff reported that he laughs at her, taunting her that she cannot prove it. AR 192.  As a result,
Plaintiff cannot live with her mother, who remains married to him.

Plaintiff alleged that since July 15, 2003, mental problems and suicidal urges limited her
ability to work.  AR 144-45.  She became anxious, tired, and was unable to think.  AR 145.  In
November 2004, Plaintiff attempted suicide.  AR 147.  From November 2004 through June 2005,
she received counseling from Kern County Mental Health System, which provided no medication
since Plaintiff attempted suicide by a drug overdose.  AR 147.

Plaintiff last worked as a housekeeper from December 2003 to July 2005.  AR 33, 112,
145.  She dusted, mopped, swept, and cleaned baseboards, ceiling fans, and bathrooms in private
homes.  AR 34, 112, 145.

In an interview relating to Plaintiff's appeal of the agency's denial of disability benefits,
Plaintiff reported that her depression had increased since her fiancé died.  AR 161.  She was then
living on the streets and trying to get into a program.  AR 161.  Her vision had worsened, and she
was crying and sleeping a lot.  AR 161.  She did not socialize and wanted to be left alone.  AR
163.  On November 2, 2006, Plaintiff had seen Dr. Valentine Birds at Budget Medical Clinic, who
had prescribed Wellbutrin for depression.[2]  AR 162.

**Kern County Mental Health Records (AR 167-199).**  Kern County Mental Health
Systems ("KCMH") treated Plaintiff from July 29, 2002 through November 29, 2004.  At intake,
Plaintiff reported extreme difficulty making decisions, getting places on time, finding and
maintaining employment, adjusting to stresses in her relationships, and handling her emotions.
AR 197.  She had been using alcohol for 23 years and wanted to stop.  AR 187, 189.  She was
homeless and had been sleeping in the park since her family "kicked her out."  AR 195.  Only two
of her children were then living with her.  AR 189.  Working with others who had made it to
recovery had inspired her to seek help.  AR 195.  Her psychiatric symptoms included`:

> Can't sleep, feels phys[ically] shaky during day; keeping "day by day" schedule;
> feels depressed "wants to just [illegible] myself and I'm claustrophobic" isolates at

---

[2]  Plaintiff testified that she took Wellbutrin samples that Dr. Birds gave her.  AR 38-39.

1   home–"when I'm sober, I can't talk/be in a relationship"; low self esteem; can't
2   conc[entrate] & remember; no motivation –"feels lost"; constantly fatigued; feels
    worthless.

3   AR 195.

4   Plaintiff reported experiencing severe depression, severe anxiety, and difficulty

5   understanding others throughout her life and within the past thirty days.  AR 184.  In the past,

6   Plaintiff had experienced hallucinations, had suicidal thoughts, and had attempted suicide.  AR

7   184.

8   Plaintiff's diagnosis was:

9   Axis I:          296.32 Major Depressive Disorder, Recurrent, Moderate
                     303.90 Alcohol Dependence, Early Full Remission
10
11  Axis II:         799.9 [diagnosis or condition deferred]

    Axis III:
12
13  Axis IV:         sober 1 month; can't find employment; children living with relatives
                     (2 are in home)

14  Axis V:          Current GAF: 41       Highest GAF: UK

15  AR 190.[3]

16  The clinician noted that Plaintiff had severe functional impairments in community participation,

17  community contribution, relationships with others, and physical and emotional health.  AR 190.

18  Plaintiff's first treatment goal was to reduce her depression from level eight to level four

19  over eight months.  AR 189, 198.  Initially, she was scheduled for at least one weekly session of

20  group therapy, one weekly life skills class, and regular medical follow up of her medications.  AR

21  189, 198-199.  Plaintiff was to continue attending Alcoholics Anonymous.  AR 189, 199.

22  ///

23

24     [3]  The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall
    functioning on Axis V of the diagnosis.  American Psychiatric Association, Diagnostic and Statistical Manual of
25  Mental Disorders at 32 (4th ed., Text Revision 2000) ("DSM IV TR").  It considers "psychological, social, and
    occupational functioning on a hypothetical continuum of mental health-illness," excluding "impairment in
26  functioning due to physical (or environmental) limitations." Id. at 34.  The first description in the range indicates
    symptom severity; the second, level of functioning.  Id. at 32.  In the case of discordant symptom and functioning
27  scores, the final GAF rating always reflects the worse of the ratings.  Id. at 33.
           GAF 41 is at the bottom of the range GAF 41-50, which indicates "[s]erious symptoms (e.g., suicidal
28  ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or
    school functioning (e.g. no friends, unable to keep a job).

1    Although Plaintiff made some progress, her treatment at KCMH ended on or about

2    September 6, 2002, when she secured a housekeeping job.  AR 176, 180.  Her hours of work

3    conflicted with the times that therapy was offered.  AR 180.  KCMH closed Plaintiff's treatment

4    file on November 14, 2002.  AR 177.

5    Plaintiff returned to KCMH on or about September 20, 2004.  AR 174.  Plaintiff had

6    attempted suicide by overdosing on Elavil, Methedrine, and PCP after her children were removed

7    from her home by California Protective Services.  AR 173, 174.  She had been hospitalized for

8    five days.  AR 200.  Her GAF score was 30.[4]  AR 172.  On November 24, 2004, KCMH referred

9    Plaintiff for further service.  AR 167.  Nothing in the record indicates that Plaintiff received

10   further treatment, however.

11   **Correctional Mental Health Screening.**  On or about April 18, 2005, Plaintiff was

12   arrested and charged with being under the influence of a controlled substance (PCP).  AR 206-

13   207.  Plaintiff was depressed and hearing command voices.  AR 206.  On May 6, 2005, staff

14   member Gillingham screened Plaintiff for mental health issues.  AR 206-207.  She recommended

15   that Plaintiff receive crisis intervention counseling, stress reduction-relaxation exercises, and a

16   psychiatric evaluation.  AR 207.

17   **Plaintiff's First Adult Function Report (SSA Form 3368).**  In an Adult Function Report

18   dated August 31, 2005, Plaintiff reported that, because she did not sleep well, she didn't really

19   remember what she did all day.  AR 118.  Instead of sleeping, she paced and drank warm milk

20   because she heard voices and saw things that weren't there.  AR 119.  She took no medications.

21   AR 120.

22   Plaintiff reported that she lived in an apartment with relatives.  AR 118.  She stayed inside

23   because she had low self-esteem and did not like being around people.  AR 118, 121.  She felt

24   secure if people she knew were with her.  AR 121.  Being out in public made her "anxious and

25   nervous."  AR 124.  Going into stores made her so nervous that she broke out in hives.  AR 119.

26

27        [4]  GAF 30 falls at the top of the range 21-30, indicating "[b]ehavior is considerably influenced by delusions
     or hallucinations OR serious impairment in communication or judgment (e.g. sometimes incoherent, acts grossly
28   inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job,
     home, or friends).  DSM IV TR at 34.

Others shopped for her twice a month if she could afford it.  AR 121.  Stress increased Plaintiff's depression so she stayed away from stressful situations.  AR 124.  Plaintiff spent her days crying and sleeping.  AR 120.

Plaintiff enjoyed petting her cat, who was the first pet she had.  AR 119.  Her aunt was teaching her to care for the cat by feeding him and keeping him clean.  AR 119.  Her aunt also encouraged her to get up and dress nicely, and not to isolate herself.  AR 120.  Later in the same document, however, Plaintiff reported that she did not like going outdoors since her aunt died.  AR 122.

Plaintiff ate very little.  AR 120.  She drank water and prepared ramen noodles in the morning and evening if she felt hungry.  AR 120.

Plaintiff did her laundry and organized her belongings each day.  AR 120.  She reported that she was unable to pay bills, count change, or use a checking or savings account, explaining "I'm not good at counting any money, especially a lot of it."  AR 121.

Plaintiff reported that she did not see or hear well.  AR 123.  She had a hereditary eye disease and did not drive.  AR 121.  She needed to wear glasses all the time but, although she had gotten glasses in or about 2002, she lost them and had not replaced them.  AR 124.  She watched television and read a little, but it strained her eyes.  AR 122.  She was easily discouraged and found completing tasks difficult.  AR 123.

**Cousin's Report.**  A third-party report from Plaintiff's cousin, Lupe Arrieta, dated September 1, 2005, reported that Plaintiff was homeless.  AR 126.  Plaintiff spent about one day a week at Arrieta's home, just sitting around and eating food Arrieta had prepared.  AR 126.  Arrieta did not know how Plaintiff filled her time on other days.  AR 126.

Arrieta recalled that Plaintiff had once functioned normally: holding a job, paying bills, buying food.  AR 130.  Now Plaintiff sat alone by herself.  AR 130.  She had no hobbies.  AR 130.  Although Arrieta encouraged Plaintiff to help with household chores when she visited Arrieta's home, Plaintiff was afraid to help for fear of messing something up.  AR 128.  Plaintiff felt she could do nothing right.  AR 129, 133. Despite encouragement, Plaintiff was reluctant to use Arrieta's washer to launder her clothes because she had no money to pay Arrieta.  AR 128.

1    According to Arrieta, Plaintiff had a poor memory and had difficulty following

2  instructions without assistance.  AR 131.  She could pay attention for no more than ten minutes,

3  AR 131.  Sometimes while speaking, Plaintiff suddenly and inexplicitly changed subjects.  AR

4  131.

5    Arrieta reported that Plaintiff did not like to go out, fearing that people were staring at her.

6  AR 129.  Plaintiff believed she was "inferior," "always wrong," a "bad person" and a "nobody,"

7  and feared being hurt.  AR 129, 131, 132.  She feared offending people and being rejected.  AR

8  133.  Arrieta reported that in the past, others had treated Plaintiff badly and taken advantage of

9  her.  AR 133.  Arrieta thought Plaintiff might have previously been attacked.  AR 129.  Plaintiff

10  did not handle stress well, responding by crying, getting a headache, and withdrawing.  AR 132.

11  Arrieta thought Plaintiff needed psychiatric care.  AR 133.

12    Others tried to shop for Plaintiff once a month.  AR 129.  If Plaintiff went out, someone

13  had to accompany her and do most of the task.  AR 130.  Arrieta was concerned that Plaintiff

14  spent her time alone, instead of interacting with others.  AR 129.

15    According to Arrieta, Plaintiff once drove but had not done so for years.  AR 129.

16  Plaintiff did not see well now.  AR 131, 132. Characterizing Plaintiff's eye problem as "severe,"

17  Arrieta thought Plaintiff needed to see an optometrist and get glasses.  AR 129, 130, 132.

18  Plaintiff's hearing also seemed to be deteriorating.  AR 131.

19    **Agency Evaluation.**  On September 3, 2005, Dr. Chris Saindon conducted a

20  "comprehensive psychiatric evaluation" under contract with the agency.  AR 200-203.  Plaintiff

21  was present for an appointment.  AR 200.  Saindon reported that his review of Plaintiff's records

22  consisted of an incomplete copy of SSA Form 3368.  AR 200.  Accordingly, Saindon's evaluation

23  appears to have been based on Plaintiff's self-reports of her medical history and condition, and on

24  a mental status examination that consisted of Saindon's evaluating Plaintiff's physical appearance

25  and administering a series of questions to determine whether Plaintiff is (1) oriented in time,

26  place, and person; (2) able to remember four words with prompting in three minutes; (3) able to

27  name past presidents; (4) knows the governor and capital of California; (5) able to perform simple

28  addition ($7 + 5 = 12$ and $12 + 13 = 25$); (6) able to perform a three-step command; (7) able to

1  express a similarity and difference for an apple and an orange (Plaintiff said that they both had

2  vitamins but were different in color); (8) able to think abstractly (Plaintiff said that *don't cry over*

3  *spilt milk* meant "Watch what you are doing"); and (9) able to exercise judgment and insight

4  (Plaintiff said that if she found a stamped, addressed envelope on the sidewalk, she would take it

5  to the nearest building).  AR 202.  Saindon noted that Plaintiff's mood was dysthymic

6  (depressed).  AR 201.  He stated, "The claimant is a reliable historian," but does not explain why

7  he believed this to be the case.  AR 201.

8          Saindon's diagnosis of Plaintiff was

9          Axis I:          Posttraumatic stress disorder.

10         Axis II:         Deferred.

11         Axis III:        Anemia.
                            Glaucoma.

12

13         Axis IV:         Social isolation.

14         Axis V:          Current GAF: 55.

15         AR 202.[5]

16         Saindon opined that Plaintiff's acute and chronic problems were treatable and that she was

17  likely to recover within the next twelve months.  AR 202.  He concluded:

18         The claimant is capable of managing her own funds based upon her judgment and
           ability to calculate.

19         The claimant would be able to perform simple and repetitive tasks, as well as more
           detailed and complex tasks.

20

21         The claimant at this time would have some difficulty accepting instructions from
           supervisors and interacting with coworkers and the public.

22         The claimant would have some difficulty performing work activities on a
           consistent basis.

23

24         The claimant would have some difficulty maintaining regular attendance in the
           workplace and complete [*sic*] a normal workday and workweek without
           interruptions from a psychiatric condition.

25  ///

26

27         [5] GAF 55 falls within the range 51-60, indicating "[m]oderate symptoms (e.g. flat affect and circumstantial

28  speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few
    friends, conflicts with peers or co-workers).  DSM IV TR at 34.

The claimant would have some difficulty dealing with the usual stressors encountered in competitive work.

AR 203.

**Plaintiff's Second Adult Function Report.**[6]   On September 12, 2005, less than a month after completing her first adult function report, Plaintiff completed another.  AR 134-141.  She reported that she was homeless and lived alone.  AR 134.  She once had a cat but "they took him away."  AR 135.

Plaintiff did not like others to look at her.  AR 138.  She feared going outside for fear someone would hurt her.  AR 137, 140.  She feared being raped.  AR 137.  If possible, she did not go out at all.  AR 137, 139.  She preferred that someone shop for her.  AR 137.  But later in the report, Plaintiff wrote, "I don't like to be closed in or my mind really hurts."  AR 138.  When she was alone, she was nervous and feared someone would hurt her.  AR 138.

Plaintiff explained her sleeplessness as arising from a feeling that everything was closing in on her.  AR 135.  "I feel like clut[t]ered," she explained.  AR 135.

Plaintiff reported that she ate whenever she could eat or when someone asked her to eat. AR 136.  She ate little because "[I] don't want to eat everyone's food."  AR 135.  She did not cook on a stove because she did not want to get burned.  AR 136.

In response to questions about housework, Plaintiff replied that she sometimes washed her plate in the rest room but did not like to do that "to[o] much [be]cause it's not mine."  AR 136. Asked whether she needed help or encouragement to do her housework, Plaintiff responded, "I sometimes just sit and look and I forget to do things.  I don't like being alone."  AR 136.

Plaintiff explained that she was previously able to make decisions but was now uncertain whether her "choices were good or not."  AR 135.  When she woke up, she tried not to bother anyone and stayed inside more than she should.  AR 134.  She had low self-esteem.  AR 134.  Her memory was poor.  AR 139. She needed reminders to remember to take care of important things. AR 138.  She put things away and could not find them later.  AR 139.  People needed to repeat

---

[6]  The handwriting, spelling and punctuation differ greatly between the first and second report.  It appears possible that someone else completed one or both reports on Plaintiff's behalf.

instructions more than they wanted to.  AR 139.  Asked how long she could pay attention, she responded, "I get confused so I don't like to be dum[b]."  AR 139.

Plaintiff was unable to pay bills, count change, or handle a savings or checking account since trying to count money made her head hurt.  AR 137.  Stress generally gave her a headache.  AR 140.

Because of her eye disease, light hurt her eyes.  AR 137.  Plaintiff feared doing activities badly because her vision was blurry.  AR 138.  She got glasses two or three years ago and needed to wear them all the time.  AR 140

**Consultant Review**.  A Psychiatric Review Technique Form (SSA-2506-BK), dated October 20, 2005, concluded that Plaintiff had a co-existing non-mental impairment, anxiety-related disorder, substance addiction disorder, and post-traumatic stress syndrome.  AR 209, 214.  It reported that Plaintiff had mild restriction of activities of daily living and mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  AR 219.  The mental residual functional capacity assessment concluded that Plaintiff was moderately limited in only two areas: the ability to understand and remember detailed instructions and the ability to carry out detailed instructions.  AR 223-224.

**Plaintiff's testimony.**  The agency held a hearing on December 11, 2007.  AR 30.  Plaintiff was then homeless and had slept in a car the prior night.  AR 39.  She ate at a shelter.  AR 40.  During the day, she might shower at the welfare department, stop by to visit her mother, or go to the library.  AR 40.  Although she was not seeking a job, plaintiff also spent time at the welfare office looking at the job searches and other postings for lack of anything else to do.  AR 41.

Plaintiff did not ride buses because she did not like to be confined with so many people.  AR 41.  Plaintiff avoided people who did not understand her.  AR 41.  Pressed to explain, Plaintiff said, "How they judge me or just by the way I am."  AR 41.

Plaintiff testified that she had been sober for the past year.  AR 36.  Before that, she had only drank on weekends but not during the week.  AR 36.  When she drank in the past, she consumed about a twelve-pack of beer on the weekends.  AR 36.  Plaintiff denied that her

drinking resulted in any law enforcement problems such as driving under the influence or drunk and disorderly charges.  AR 36.  She had not used street drugs since she was a teenager.  AR 36.

Plaintiff had last had psychiatric treatment after her suicide attempt in November 2004, which was caused by depression.  AR 36-37.  She had gone to the crisis center in 2005 after losing her children.  AR 38.  She last took medication (Wellbutrin samples) six months earlier, to treat depression arising from flashbacks of her brother's sexual abusing her.  AR 38-39.  Plaintiff was still experiencing flashbacks, which kept her from sleeping.  AR 39.  She had tried to commit suicide recently but her mother found the pills that Plaintiff had attempted to steal from her.  AR 47.

Plaintiff also feared attack by a man who kidnapped her at gunpoint  a year earlier.  AR 44.  The kidnapper, who was to be released from prison the same day as the hearing, had threatened Plaintiff's life for testifying against him.  AR 44.

Plaintiff's vision was blurry.  AR 41-42.  She was unable to see well enough to read a newspaper.  AR 43.  She had been diagnosed with glaucoma.  AR 42.  Plaintiff had not seen an eye doctor in a long time.  AR 42-43.

Plaintiff was not currently receiving medical treatment because she lacked the money to get a copy of her birth certificate, which was required to get free care at the Paramedical Center.  AR 43-44.  Plaintiff was embarrassed to ask whether mental health treatment was available at the homeless shelter.  AR 46.

She had been incarcerated twice, for attempted murder and strong arm robbery, and had been out of prison since 1990.  AR 37.

## II.    Discussion

### A.    Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot,

considering age, education, and work experience, engage in any other substantial gainful work

existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated

regulations prescribing a five-step sequential process for evaluating an alleged disability. 20

C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). The process requires consideration of the following

questions:

Step one:    Is the claimant engaging in substantial gainful activity? If so, the
             claimant is found not disabled. If not, proceed to step two.

Step two:    Does the claimant have a "severe" impairment? If so, proceed to
             step three. If not, then a finding of not disabled is appropriate.

Step three:  Does the claimant's impairment or combination of impairments
             meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P,
             App. 1? If so, the claimant is automatically determined disabled. If
             not, proceed to step four.

Step four:   Is the claimant capable of performing his past work? If so, the
             claimant is not disabled. If not, proceed to step five.

Step five:   Does the claimant have the residual functional capacity to perform
             any other work? Is do, the claimant is not disabled. If not, the
             claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since July 15,

2003. AR 22. She had two severe impairments: depressive disorder with psychotic features and

post-traumatic stress disorder (20 C.F.R. §§ 404.1520(c) and 416.920(c)). Her impairments did

not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

AR 23. She was able to perform her past work as a housekeeper. AR 28. Plaintiff had the

residual functional ability to perform a full range of work at all exertional levels, with the

limitation that she could perform simple, routine tasks that were not complex and that required

limited contact with the general public, co-workers, and supervisors. AR 24. Accordingly, the

ALJ concluded that Plaintiff was not disabled. AR 29.

///

///

### B.     Plaintiff's Claims

Plaintiff argues that, when the administrative record is considered as a whole, the ALJ's determination was neither supported by substantial evidence nor free of material legal error. She contends that, by failing to fully consider Dr. Saindon's psychiatric evaluation, the ALJ erred at step four of the analysis. Plaintiff also argues that the ALJ's consideration of other evidence, particularly the state agency opinion, was flawed.

### C.     Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

The scope of review requires this Court to consider the record as a whole, examining both the evidence supporting the ALJ's decision and the evidence that does not. When it did so, the Court discovered a record more extensive than the documents on which the ALJ had relied, which portrayed the claimant very differently than the ALJ did. When considered in light of applicable law, the Court concludes that the ALJ erred in denying Plaintiff benefits.

///

///

1

### D.    Plaintiff's Lack of Credibility

2    The ALJ found "that the claimant's statements concerning the intensity, persistence and

3 limiting effects of [her] symptoms are not entirely credible in light of the reports of the treating

4 and examining practitioners and the findings made on examination." AR 26.  This Court agrees

5 that Plaintiff's testimony and her written reports were inconsistent and ambiguous.  The record

6 suggests that Plaintiff's inconsistent testimony and written reports may be due to Plaintiff's

7 intellectual limitations and poor memory (AR 45, 46, 118, 123, 131, 135, 136, 137, 138, 139, 145,

8 173, 174, 184, 190, 195, 197, 219, 223-24),  her embarrassment at her disability (AR 46), her lack

9 of insight (AR 173, 174, 190), her extreme deference to authority figures (AR 124, 132, 133, 138,

10 140, 203), or some combination of these factors.  By simply observing that Plaintiff was not

11 completely credible, without providing specific information or further discussion, however, the

12 ALJ provides little assistance to a reviewing court.

13    The regulations acknowledge that a claimant may be unable or unwilling to describe their

14 limitations fully and accurately.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 D.1.b.  Nonetheless,

15 many claimants with mental impairments are willing and able to describe their limitations.  *Id.*

16 Accordingly, the agency's fact finders are charged with carefully examining the claimant's

17 statements to determine whether his or her statements are consistent with other information in the

18 record as well as the general pattern of impairment described by the medical and other evidence.

19 *Id.*  Although this Court must draw its conclusions from a cold record rather than from direct

20 observation of Plaintiff, it finds that Plaintiff's testimony is generally consistent with the other

21 evidence in the record.  The ALJ has provided no contradictory information or explanation to

22 defeat such a determination.

23

### E.    Analysis of Medical Evidence

24    This Court is also unimpressed with the ALJ's shallow analysis of the medical evidence in

25 this case, particularly his minimizing the records received from Plaintiff's treating physicians

26 without providing reasons for disfavoring Plaintiff's actual treatment records.  As discussed in the

27 facts statement above, the treatment records, which were provided by multiple sources, document

28 ///

1   the existence of Plaintiff's depression and its deleterious effects on her life skills and social

2   interactions for many years.

3       Three types of medical opinions may be offered in social security cases: "(1) those who

4   treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

5   (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

6   physicians)." *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more

7   weight that the opinions of doctors who did not treat the claimant, and an examining physician's

8   opinion is generally entitled to more weight than that of a non-examining physician. *Id.*  The

9   Social Security Administration favors the opinion of a treating physician over that of nontreating

10  physicians.  20 C.F.R. § 404.1527; *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).  If a treating

11  or examining physician's opinion is uncontradicted by another doctor, the Commissioner must

12  provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions.

13  *Lester*, 81 F.3d at 830.  *See also Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988) ("[T]he

14  medical opinions of a claimant's treating physicians are entitled to special weight and . . . if the

15  ALJ chooses to disregard them, 'he must set forth specific, legitimate reasons for doing so, and

16  this decision must itself be based on substantial evidence.'")(*citations omitted*). The ALJ may not

17  substitute his or her own judgment for that of a treating source so long as the treating source's

18  opinion of an impairment's nature or severity is "well-supported by medically acceptable clinical

19  and laboratory diagnostic techniques and is not consistent with other substantial evidence."  SSR

20  96-2P at *1,  61 Fed.Reg. 34,490, 34,491, 1996 WL 374188 (July 2, 1996).  *See also* 20 C.F.R. §

21  1527(d)(2).  When the ALJ fails to set forth adequate reasons for rejecting the opinion of a

22  treating examining physician, the court credits that opinion as a matter of law.  *Lester*, 81 F.3d at

23  834.

24      If the treating or examining doctor's medical opinion is contradicted by another doctor, the

25  Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion,

26  supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830-31; *accord Valentine v.*

27  *Commissioner of Social Security Administration*, 574 F.3d 685, 692 (9th Cir. 2009).  "The ALJ

28  can meet this burden by setting out a detailed and thorough summary of the facts and conflicting

clinical evidence, stating [her] interpretation thereof, and making findings.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008), *quoting Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Opinions of nontreating physicians are substantial evidence when they are supported by clinical findings and objective tests. *Magallanes*, 881 F.2d at 751. If the ALJ rejects an examining physician's opinion in reliance on a non-examining physician, "reports of the nonexamining advisor need not be discounted and may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995); *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 1113 (1997).

"An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible." *Tommasetti*, 533 F.3d at 1041, *citing Morgan v. Commissioner of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999). In explaining how to apply § 404.1527, Social Security Ruling 96-2p emphasizes:

1.  A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2.  Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

3.  Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4.  Even if a treating source's medical opinion is well supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5.  The judgment whether a treating source's medical opinion is well supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6.  If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted.

7.  A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

Social Security Ruling 96-2P.

1  A court's task is not to re-weigh the evidence but to determine whether the ALJ's

2  determination is supported by substantial evidence and free of legal error.  The reviewing court

3  must review the ALJ's express reason for declining to adopt a doctor's opinion and determine

4  whether the rejection was specific and legitimate.

5  This Court is baffled by the ALJ's reasoning in evaluating the medical evidence and

6  opinions submitted in this case.  First, the ALJ assigned "some weight" to Plaintiff's medical

7  records from KCMS, characterizing them as "somewhat supported" by the medical evidence.  If

8  Plaintiff's treatment records from KCMS are not themselves "medical evidence," this Court is

9  uncertain what the ALJ considered to be medical evidence.  *See* AR 27.  A claimant's history of

10  mental impairments, records of mental status examinations and psychological testing,

11  hospitalizations, and treatment constitute his or her medical evidence.  20 C.F.R., Pt. 404, Subpt.

12  P, App. 1, § 12.00D.1.a.  In so far as is possible, the reports should also include relevant

13  information regarding the claimant's daily living; social functioning; concentration, persistence,

14  and pace; and episodes of decompensation.  *Id.*  Plaintiff's medical records from KCMS and

15  correctional services easily fall within the requirements of the regulations.

16  In addition, this Court is not persuaded by the ALJ's assigning significant weight to

17  Saindon's assessment, in light of Saindon's apparent reliance on nothing more than Plaintiff's

18  self-reports and a partial copy of Plaintiff's first adult function report.  *See* AR 27.  *See Barbato v.*

19  *Commissioner of Social Security Admin.*, 923 F.Supp. 1273, 1277 (C.D.Cal. 1996) (rejecting a

20  non-examining physician's opinion where the physician's opinion was inconsistent with those of

21  the treating physicians and the non-examining physician had not reviewed the most recent reports

22  concerning the claimant's ailment).  Concentrated on Plaintiff's ability to perform very simple

23  intellectual tasks, the mental status evaluation that Saindon administered had no apparent relation

24  to Plaintiff's claim of severe depression nor to any of the symptoms or disabilities that might

25  result from depression.  Saindon's limited knowledge of Plaintiff's history of severe depression is

26  implicit in his dating her depression from her confrontation of her brother a year before.  AR 200.

27  As a result, Saindon's determination that treatment could resolve Plaintiff's depression in less

28  than a year is ill-informed and entitled to little weight.  AR 202.  Nonetheless, Saindon recognized

that Plaintiff would have difficulty accepting instructions from supervisors, difficulty interacting with co-workers and the public, difficulty performing work activities on a consistent basis, difficulty maintaining usual attendance in the workplace, difficulty completing a normal workday and work week without interruptions from her psychiatric condition, and difficulty dealing with the usual stressors encountered in competitive work.  AR 202-03.  Despite expressing his reliance on Saindon's opinion, the ALJ never acknowledged or commented on Saindon's assessment of Plaintiff's limitations.

Finally, this Court rejects the ALJ's use of the Psychiatric Review Technique and Mental Residual Functional Capacity Assessment as evidence.  AR 27.  These two documents set forth nothing more than the state agency's unelaborated analysis and conclusions, unsupported by either reasoning or links to the record.  As such, they represent nothing more than the determinations from which Plaintiff appealed, without providing any analysis or insight into the agency's consideration of Plaintiff's disability.

**F.    Analysis of Step Three**

At step three, the agency is required to ask whether the claimant's impairment or combination of impairments meets or equals an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1.  If it does, the claimant is automatically determined to be disabled, but if it does not, the analysis must proceed to step four.   In light of its review of the complete record and reconsideration of the medical evidence, this Court concludes that Plaintiff should have been characterized as disabled at step three of the analysis, without the need for further analysis of steps four or five.

**1.    The Disability Listing**

The relevant listing for a claimant disabled by an affective disorder such as depression, is 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.04, which provides, in pertinent part:

> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A.  Medically documented persistence, either continuous or intermittent, of one of the following:
>
> 1. Depressive syndrome characterized by at least four of the following:

a.  Anhedonia or pervasive loss of interest in almost all activities;

b.  Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d.  Psychomotor agitation or retardation; or

e.  Decreased energy; or

f.  Feelings of guilt or worthlessness; or

g.  Difficulty concentrating or thinking; or

h.  Thoughts of suicide; or

I.  Hallucinations, delusions, or paranoid thinking; or

* * * * *

AND

B.  Resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence or pace; or

4.  Repeated episodes of decompensation, each of extended duration.

OR

C.  Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.  Repeated episodes of decompensation, each of extended duration; or

2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.  Current history of 1 or more years' inability to function outside a highly supportive living environment, with an indication of continued need for such an arrangement.

///

///

1

2.      **Sections 12.04 A and B**

2       The ALJ concluded that Plaintiff was severely impaired by a depressive disorder with

3   psychotic features and posttraumatic stress disorder.  AR 22.  Other than summarizing the KCMS

4   record, Dr. Saindon's report, and the May 10, 2005 correctional mental health screening, however,

5   the ALJ did not discuss § 12.04A beyond acknowledging that Plaintiff had experienced auditory

6   "command" hallucinations.  AR 22-23.  He stated:

7           The record does not report the existence of any functional limitations and or
            diagnostic test results, which would suggest that the impairments meet or equal the
8           criteria of any specific listing.  In addition, no treating or examining physician has
            reported findings, which either meet or are equivalent in severity to the criteria of
9           any listed impairment, nor are such findings indicated or suggested by the medical
            evidence in the record.
10
11      AR 23.

        Section 12.04A imposes no severity requirement, however, instead requiring that the depressive
12
        syndrome be persistent, continuous, or intermittent.
13

14      Based on its review of the record as a whole, this Court concludes that Plaintiff has

15   satisfied § 12.04A as a matter of law.  As set forth in the fact statement above, overwhelming and

16   uncontradicted evidence, from both medical and lay sources, establishes that Plaintiff has

17   demonstrated an almost complete lack of interest in all activities (§ 12.04A (a)), profound sleep

18   disturbances (§ 12.04A(c)), decreased energy (§ 12.04A(e)), feelings of guilt and worthlessness (§

19   12.04A(f)), difficulty concentrating and thinking (§ 12.04A(g)), suicidal thoughts and actions (§

20   12.04A(h)), and hallucinations, delusions, and paranoid thinking (§ 12.04A(I)).  Her depression

21   and the symptoms that led the physicians who treated her to diagnose her as depressed are well-

        documented by her medical records.
22
23      When Plaintiff initially sought treatment at KCMS in July 2002, Plaintiff reported an

24   inability to sleep, need to socially isolate herself, low self esteem, inability to concentrate or

25   remember, lack of motivation, fatigue and feelings of worthlessness.  AR 184, 195.  Her medical

26   history included hallucinations and suicide attempts.  AR 184.  The KCMS clinicians diagnosed

27   major recurrent depressive disorder (moderate) and alcohol dependence in remission, and globally

28   assessed Plaintiff's functioning at 41, indicating "[s]erious  symptoms (e.g., suicidal ideation,

severe obsessional rituals, frequent shoplifting) OR any serious impairment in social,

occupational, or school functioning (e.g. no friends, unable to keep a job)." DSM IV TR at 34.

Plaintiff returned to KCMS on September 20, 2004, after a suicide attempt and five days

of hospitalization. AR 174, 200. Her GAF was then 30 ( "[b]ehavior is considerably influenced

by delusions or hallucinations OR serious impairment in communication or judgment (e.g.

sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to

function in almost all areas (e.g., stays in bed all day, no job, home, or friends). DSM IV TR at

34.)

Following an arrest in April 2005, correctional health care staff referred Plaintiff for crisis

intervention counseling and a psychiatric evaluation since she was depressed and hearing voices.

AR 206-07.

In a progress note dated November 29, 2004, nurse Dale Siemens wrote:

> April has been increasingly depressed during the past 2 months. She is unable to
> work, she has no home, her children have been taken from her, and she believes
> that counseling would help her.

AR 168.

Responding to a question of how Plaintiff's illness had changed her ability to handle

money, niece Arrieta observed, "Before she had a job, payed bills like all of us, bought food.

Now she does not do any of these." AR 130.

In concluding that Plaintiff had only mild restrictions in daily living and social

functioning, the ALJ acknowledged only Plaintiff's August 31, 2005, adult function report. AR

23-24. He wrote:

> The claimant reported in her adult function report on August 31, 2005 that she is
> able to take care of a pet cat, take care of her personal care, prepare meals, do
> laundry, clean, go shopping in stores, read magazines, and watch television.
> (Exhibit 2E). Lupe Arriets [sic], the claimant's cousin, reported on September 1,
> 2005 that the claimant is able to take care of her personal care and prepare meals,
> but didn't seem to know what she did all day. (Exhibit 3E). Dr. Saindon reported
> on September 3, 2005 that the claimant performed her own cooking and
> housework. (Exhibit 2F page 2).

AR 23-24.

> The claimant reported that she lived with her aunt and worked with her in daily
> activities. (Exhibit 2E). Dr. Saindon reported on September 3, 2005 that the

21

claimant had a friend drive her to the examination and lived with her aunt. (Exhibit 2F page 1).

AR 24.

Painting a picture of a sad and isolated homeless woman who lacks the confidence even to use her niece's washing machine, the record does not support the ALJ's findings that Plaintiff had merely mild impairments of daily living skills and social functioning.  Viewed as a whole, the record simply does not include substantial evidence to support the ALJ's analysis.  Substantial evidence permits only a single conclusion: Plaintiff's depressive disorder has resulted in both marked restriction of her activities of daily living and marked difficulties in maintaining relationships with others.  The regulations provide:

> *Activities of daily living* include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.  In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness and sustainability.  We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

> We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function.  For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

> 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 C.1.

> *Social functioning* refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.  Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers.  You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation.  You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities.  We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity.  Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

> We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function.  For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local storekeepers, we may nonetheless find that you

have a marked limitation in social functioning because that behavior is not acceptable in other social contexts.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 C.2.

The regulations also recognize that an individual with chronic mental impairments will commonly structure his or her life to minimize stress and reduce symptoms and signs.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 E.  Accordingly, a review of all pertinent information, particularly reports relating to times of severe stress, is essential in evaluating a mental disability claim.  *Id.*

The ALJ's failure to acknowledge Plaintiff's homelessness is but the beginning of his failure to perceive her inability to function on a day-to-day basis and to participate in normal social relations.   Plaintiff used her mother's home as a mailing address but did not live there, because of animosity between Plaintiff and her mother's husband, whom Plaintiff accuses of molesting her daughters.  AR 192.  In the July 29, 2002 intake report for services through KCMH, Plaintiff was homeless and had been sleeping in the park since her family "kicked her out."  AR 195.  On August 31, 2005, Plaintiff reported that she was living with relatives.  AR 118.  Plaintiff implied that she was then living with her aunt, who, among other things, was teaching her to care for a cat and encouraging her to get dressed and go out.  Later in the same report, however, Plaintiff disclosed that her aunt was dead.  AR 122.

In a report dated the next day (September 1, 2005), Plaintiff's cousin, Lupe Arrieta, reported that Plaintiff was homeless.  AR 126.  In his September 3, 2005 report, perhaps relying on Plaintiff's August 31, 2005 report, Dr. Saindon stated that Plaintiff was living with her aunt. AR 200.  Less than two weeks later, on September 12, 2005, Plaintiff herself reported that she was homeless.  AR 134.  Plaintiff was also homeless when, in a disability interview report dated April 14, 2006, Plaintiff told the interviewer than she had been living on the streets since her fiancé died.[7]  AR 161.  At the hearing on December 11, 2007, Plaintiff testified that she was homeless and slept in a car the previous night.  AR 39.

///

---

[7]  This is the sole mention in the record of a fiancé.

1    When the record is considered as a whole, Plaintiff's August 31, 2005 report that she lived

2  with an aunt who cared for her and encouraged her to overcome her problems suggests that

3  Plaintiff may have been delusional or not oriented in time.  But the fact finding in the

4  administrative decision never acknowledges the complexity of the record or conducts an analysis

5  of the record as a whole, much less exploring any relationship between Plaintiff's supposed

6  credibility issues and her alleged mental disability.  For example, to the extent that the ALJ partly

7  based his conclusion that Plaintiff was only mildly disabled in daily living skills on her ability to

8  independently care for a cat suggests that the ALJ never read Plaintiff's second adult functioning

9  report, much less considered the physical and substantive differences between the two documents.

10  Plaintiff's statement that *her aunt was teaching her to care for the cat* by feeding him and keeping

11  him clean could also be interpreted to indicate that Plaintiff was unable to care for a cat without

12  assistance.  AR 119.  Whichever interpretation is correct, by September 12, 2005, Plaintiff

13  reported that "they" had taken the cat away.  AR 135.  More seriously, the ALJ's opinion never

14  addresses the implications of California Protective Services' removing Plaintiff's unemancipated

15  children from her custody.  Governmental removal of Plaintiff's children from her care is

16  certainly relevant to Plaintiff's daily living skills and social interactions.

17    Plaintiff's ability to prepare her own meals, as the ALJ found, is similarly questionable.

18  Plaintiff drank water and prepared ramen noodles when she was hungry.[8]  AR 120.  When she

19  visited Arrieta, Plaintiff ate food that Arrieta had prepared or made a sandwich if Arrieta told her

20  to make one.  AR 126, 128.  Arrieta pointed out that Plaintiff, who was homeless, had nowhere to

21  cook.  AR 128.  Although she ate whenever she could eat or whenever someone offered her food,

22  Plaintiff ate little because she did not want "to eat everyone's food."  AR 135-36.  Plaintiff did not

23  cook on a stove because she was afraid of burning herself.  AR 136.  Plaintiff ate breakfast and

24  lunch at a homeless shelter.  AR 40.  Nonetheless, Plaintiff  told Dr. Saindon that she did her own

25  cooking.  AR 201.

26  ///

---

[8]  Ramen noodles, a cheap and easy mainstay of college dormitories, require only a cup of hot water to become soft and edible.

1      That the evidence establishes Plaintiff's ability to do laundry and clean is doubtful.

2  Plaintiff reported that she did laundry and organized her things daily.  AR 120.  But she declined

3  to help Arrieta with household chores, fearing she would mess something up.  AR 128.  She also

4  declined to use Arrieta's washer, pleading a lack of funds to repay Arrieta.  AR 128.  In her

5  second adult function report, in which Plaintiff acknowledged her homelessness, she claimed to

6  sometimes wash her plate in the rest room but explained that she was reluctant to wash it because

7  it wasn't hers.  AR 136.  Asked whether she needed help or encouragement to do her housework,

8  Plaintiff responded, "I sometimes just sit and look and I forget to do things.  I don't like being

9  alone."  AR 136.

10      The evidence consistently indicated Plaintiff's inability to shop independently.  AR 124.

11  Plaintiff did not like going out, and was anxious and nervous when around others, especially those

12  who were not family of friends.  AR 118, 121, 124, 129, 131, 132, 133, 137, 138, 139,  140.

13  Plaintiff perceived herself as unable to pay bills, count change, or use a checking or savings

14  account.  AR 121, 137.  She did not drive.  AR 121, 129.  All reports indicated that others

15  shopped for Plaintiff if she had funds to buy things.  AR 124, 129.  On the rare occasions when

16  Plaintiff went shopping, someone had to accompany her and handle most of the task.  AR 130.

17      The first adult function report contains the only mention of watching television and

18  reading magazines, an activity Plaintiff reported doing only a little because it strained her eyes.

19  AR 122.  Plaintiff testified that her vision was so blurry that she could not read a newspaper.  AR

20  43.

21      Even Saindon, to whose opinion the ALJ assigned "significant weight" (AR 27), opined

22  that Plaintiff : (1) would have difficulty accepting instructions from supervisors and interacting

23  with coworkers and the public; (2) would have difficulty performing work activities on a

24  consistent basis; (3) would have difficulty maintaining regular attendance in the workplace and

25  complete [*sic*] a normal workday and workweek without interruptions from a psychiatric

26  condition; and (4)  would have some difficulty dealing with the usual stressors encountered in

27  competitive work.  *See* AR 202-203.

28  *///*

1    In short, substantial evidence does not support the administrative opinion.  To the contrary,

2 considered as a whole, the record indicates that Plaintiff's mental illness resulted in marked

3 impairment of the activities of daily living and social interaction.  Accordingly, at the end of step

4 three, Plaintiff must automatically be determined to be disabled, and no further analysis is

5 required.

6 **III.    Conclusion**

7    "The court shall have the power to enter, upon pleadings and transcript of record, a

8 judgment affirming, modifying, or reversing the decision of the Secretary, with or without

9 remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In social security cases, the decision to

10 remand to the Commissioner to award benefits is within the court's discretion.  *McAllister v.*

11 *Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  "If additional proceedings can remedy defects in the

12 original administrative proceedings, a social security case should be remanded.  Where, however,

13 a rehearing would simply delay receipt of benefits, reversal and an award of benefits is

14 appropriate."  *Id.* (citation omitted).  If the record is fully developed and further administrative

15 proceedings will serve no useful purpose, a reviewing court should simply reverse and award

16 benefits.  *Varney v. Secretary of Health and Human Services*, 859 F.2d 1396, 1399 (9th Cir. 1988).

17    Accordingly, this Court orders that the administrative determination be REVERSED and

18 the case REMANDED for payment of benefits.  The Clerk of Court is hereby directed to ENTER

19 JUDGMENT in favor of Plaintiff April D. Reyes and against Defendant Michael J. Astrue,

20 Commissioner of Social Security.

21

22 IT IS SO ORDERED.

23 **Dated:    July 2, 2010**              **/s/ Sandra M. Snyder**
                                  UNITED STATES MAGISTRATE JUDGE

24

25

26

27

28